# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| PENNYE BARDWELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-06-0171 |
| | § | |
| GLOBALSANTAFE DRILLING CO., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pennye Bardwell sued her former employer, GlobalSantaFe Drilling Company ("Global"), in Texas state court.  She alleged that she was an "older female employee" and that Global unlawfully fired her because of sex discrimination and retaliated against her for complaining of discriminatory treatment.  Bardwell sued under the Texas Commission on Human Rights Act (TCHRA), Tex. Lab. Code § 21.001 *et seq.*  She subsequently amended her complaint to remove the retaliation claim and to add a wrongful termination claim under the Family and Medical Leave Act, 29 U.S.C. § 2611 *et seq.* ("FMLA").  Global timely removed on the basis of federal-question jurisdiction.

Global moved for summary judgment on the ground that Bardwell's employment was terminated because she failed to report to work as scheduled and did not provide notice that she would be unable to do so, not because of sex discrimination. Global also moved for summary judgment on Bardwell's FMLA claim, asserting that the undisputed facts show she

was not protected by the FMLA when she was discharged because she did not have a serious health condition and because she did not comply with Global's policy for employees returning from leave.  (Docket Entry No. 12).[1]    Global also moves to strike Bardwell's experts, arguing that she failed to designate them properly under Rule 26(a)(2) of the Federal Rules of Civil Procedure.  (Docket Entry No. 14).

Bardwell has responded to both motions, (Docket Entries No. 18, 19), and Global has replied, (Docket Entries No. 20, 21).  Bardwell cross-moves for partial summary judgment on her FMLA claim, asserting that as a matter of law, Global wrongfully failed to reinstate her after her FMLA-protected sick leave.  (Docket Entry No. 15).  Global has responded to Bardwell's motion for partial summary judgment.  (Docket Entry No. 17).

Based on a careful review of the motion, the responses and replies, the record, and the applicable law, this court grants Global's motion for summary judgment and denies Bardwell's motion for partial summary judgment.  Global's motion to strike Bardwell's experts is denied as moot.  The reasons for these rulings are set out below.

---

[1]Global also moved for summary judgment on a sexual harassment claim.  (Docket Entry No. 12). Global argued that Bardwell abandoned this claim in both her pleadings and in discovery and that she cannot establish the elements of the claim.  Although Bardwell mentioned some instances of sexual harassment in her pleading, she later clarified that she did not allege such a claim.  (Docket Entry No. 18, p. 2).  Similarly, Bardwell mentioned in her amended pleading that after Holt became the supervisor on the Arctic I,  other females did not work on the rig; she was paid less than male employees working on the rig;  and she was denied promotions that went to male employees.  However, Bardwell did not assert these allegations as independent grounds for recovery.  Rather, she asserted that some of these events provided evidence of discrimination in the decision to fire her.

I.      **Background**

Global is a drilling contractor that owns and operates offshore rigs.  Bardwell began working for Global in November 2001 as an at-will employee.  She began with training for offshore work.  In March 2002, she was assigned to work aboard the Arctic I Rig ("Arctic I") as a "utility hand."  She worked there until her discharge in January 2004.  Arctic I workers typically worked 21 days on the rig (a period referred to as a "hitch"), then had 21 days of break off the rig.  Global maintained six different crews on the Arctic I that rotated on and off the rig on a prescheduled basis.

In both 2002 and 2003, Bardwell had missed some work because of illness.  In 2002, she left the rig after working 5 days out of the 21-day hitch and missed several weeks.  Bardwell returned to work after her doctor sent Global a release-to-return-to-work form and after arranging a date for the return.  In 2003, Bardwell missed the first two weeks of a hitch due to illness but worked the final week.  She notified Global in advance when she was able to work and appeared on the scheduled return-to-work date and was transported back to the rig.  The record does not reflect that Global's procedures for employees returning from medical absences from work changed during the time Bardwell continued to work there.

Bardwell's crew was scheduled to report to work on the Arctic I on January 7, 2004.  On January 5, Bardwell visited her doctor, Dr. Charles Allen, complaining of pain and swelling on the left side of her face and pain in her left ear.  Dr. Allen diagnosed Bardwell with temporal neuritis, an inflammation of the temporal nerve, and sinusitis, an inflamation

of the sinuses.  He prescribed an antibiotic for the sinusitis and anti-inflammatory and narcotic pain medications for the temporal neuritis.  He also ordered x-rays to be taken of Bardwell's sinuses on January 8, 2004.  Bardwell's fiancé telephoned the Arctic I on January 5 or 6 to inform them that she was ill and would not be able to report to work as scheduled January 7.  The manager who received the call relayed the information on January 6, 2004 via e-mail to both Steven Holt, the Arctic I rig manager, and Diane Spear, an employment supervisor.

Spear reached Bardwell by telephone on January 7, 2004 and told her that she needed to support her work absence with a doctor's note.  Bardwell called Dr. Allen, who faxed a note to Spear that same day.  The note stated Bardwell's diagnosis and the medicines Dr. Allen had prescribed.  The note also stated that Bardwell was scheduled for a follow-up appointment on "12/13/04." (Docket Entry No. 18, Ex. C).  Noting this incorrect date, Spear contacted Bardwell, who in turn asked Dr. Allen to fax Spear another note with the correct date for the follow-up appointment.  On January 8, 2004, Dr. Allen faxed Spear a note stating that "1/13/04" was the date of Bardwell's follow-up appointment.  (Docket Entry No. 18, Ex. C).

Bardwell's x-rays taken on January 8, 2004 revealed a "normal sinus series." (Docket Entry No. 18, Ex. C).  At her follow-up appointment with Dr. Allen on January 13, 2004, Bardwell complained of lingering pain in her face.  Dr. Allen prescribed Bardwell an additional pain medication as well as an antihistamine/decongestant.  Dr. Allen testified in

4

his deposition that, despite Bardwell's lingering symptoms, he expected that she would be able to return to work on January 20, 2004.  (Docket Entry No. 18, Ex. G at 19).  Dr. Allen faxed Spear an "Excused Absence" form on January 13, stating that "Pennye Bardwell may return to work/school on 1-20-04."  (Docket Entry No. 12, Ex. D, Attachment. 8).

Bardwell also spoke to Spear by telephone on January 13.  Bardwell told Spear that she would be able to return to work on January 20 for the last week of her hitch.  Because no helicopter transportation to the Arctic I was available on January 20, Bardwell's return to the rig was scheduled for January 21, 2004.

After speaking with Bardwell on January 13, Spear contacted Steven Holt on the Arctic I and apprised him of the situation.  Spear told Holt about her receipt of the excused absence form from Dr. Allen and Bardwell's scheduled return-to-work date of January 21, 2004.  Holt asked Spear to get a more detailed release form from Bardwell to ensure that she was fully cleared for offshore work.  Spear tried to telephone Bardwell twice on January 19 and four times on January 20 to get more a more detailed medical return-to-work release and to confirm Bardwell's return to work on January 21.  Spear was not able to reach Bardwell on January 19 or 20.  Neither Spear nor Holt received any telephone call from Bardwell advising that she would be unable to make her scheduled crew change of January 21.  Bardwell failed to appear for work on January 21.

In her deposition, Bardwell testified that she telephoned the Arctic I on January 19 or 20 to inform someone on the rig that she would not be able to return to work on  January 21.

(Docket Entry No. 12, Ex. A at 213–17).  She also testified that she called Spear from her home phone several times between January 13 and 19 and left messages asking Spear to call her back and informing Spear that she needed another week of absence from work. (*Id.*)  Holt and Spear testified that they received no telephone call or message from Bardwell.  Global submitted telephone records for those dates as well.  The records show that no Global extension received any phone calls from Bardwell's home phone number or cell phone number during that period.  (Docket Entry No. 12, Ex. G, Attachment. 1).  The telephone records show that the latest calls from Bardwell's telephone numbers were on January 6 (to the Arctic I) and on January 13 (to Spear).  (*Id.*).

Bardwell visited Dr. Allen again on January 26, 2004.  This was not a scheduled follow-up visit.  The doctor's records do not reflect that she had continuing health complaints, but rather that she "needs [a] work release."  Dr. Allen continued the antihistamine prescription for her sinusitis symptoms.  (Docket Entry No. 15, Ex. C).  Following the appointment, Dr. Allen faxed Global a second medical release.  This release stated that Bardwell could return to work on January 27, 2004  and that she had been ill since January 5, 2004.  (Docket Entry No. 15, Ex. C).

After receiving this release, Spear wrote an e-mail to Holt detailing the chain of events relating to Bardwell's illness and absence from work, including Spear's receipt of the release from Dr. Allen stating that Bardwell could return to work on January 27.  Holt wrote back that "[s]everal attempts have been made to contact Ms. Pennye.  Due to her inability to

contact this office, she is being terminated." (Docket Entry No. 15, Ex. H).  Global presented evidence that it followed a policy of discharging employees who fail to report for scheduled crew changes and who fail to return from approved leave as scheduled.  The reason, according to Holt, was that any unexpected absence on the rig required those working to do "double duty" until a replacement could be located and sent to the rig.  (*Id.*, Ex. B at 121).

Global presented evidence that it had discharged six employees who worked on the Arctic I between January 1, 2003 and January 27, 2004 for failing to make scheduled crew changes; five of those employees were male.  (*Id.*, Ex. B at 122).  Bardwell presented evidence that a male employee who was off work for extended periods because of illness did not keep Global properly informed of his health condition, yet was permitted to keep his job. (Docket Entry No. 18, Exs. D & E).  Global disputes that this employee and Bardwell were similarly situated.

Holt testified that he fired Bardwell on January 26, after receiving an email from Spear detailing the timeline of the communications from Bardwell and her doctor, based on her failure to make the scheduled crew change on January 21 without notice that she would be unable to do so.  (Docket Entry No. 15, Ex. B).  Bardwell learned of her job termination in the first week of February 2004, when she received a letter from her medical insurance company informing her that her benefits were canceled due to the termination of employment.

Bardwell filed suit in Texas state court on November 24, 2004, alleging that she had been denied promotions and paid a lower salary because of her sex.  She also alleged that she had been wrongfully terminated in retaliation for her complaints about unequal treatment and sexual harassment.  On December 30, 2005, Bardwell amended her complaint to delete the retaliation claim and to add a claim for wrongful termination under the FMLA, alleging that she had had a serious health condition in January 2003 and that her absence from work was protected by the FMLA.  On January 16, 2006, Global timely removed to federal court on the basis of federal-question jurisdiction.  (Docket Entry No. 1).

Global moves for summary judgment on all of Bardwell's claims (Docket Entry No. 12).  Global also moves to strike Bardwell's experts on the ground that she failed to designate them properly under Rule 26(a)(2) of the Federal Rules of Civil Procedure (Docket Entry No. 14).  Bardwell cross-moves for partial summary judgment on her FMLA claim.  (Docket Entry No. 15).  Each motion and response is analyzed below.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln General Ins. Co. v. Reyna*, 401 F.3d (5th Cir. 2005) (citing  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251–52 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by

"some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. Exxonmobil Corp.*, 155 Fed. Appx. 798, 800 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. Appx. at 800. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322).

### III.   Bardwell's Sex Discrimination Claim

Bardwell brought her initial claim against Global under the Texas Commission on Human Rights Act (TCHRA), which prohibits an employer from, among other things, discharging an employee because of her sex. Tex. Lab. Code § 25.051. Section 21.051(1) provides that "[a]n employer commits an unlawful employment practice if because of . . . sex . . . the employer . . . discharges an individual, or discriminates in any other manner against an individual in connection with . . . privileges of employment."

A stated purpose of the TCHRA is to "provide for the execution of policies of Title VII of the Civil Rights Act of 1964." Tex Lab. Code § 21.001(1); *see also Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001). Accordingly, "'analogous federal

10

statutes and the cases interpreting them guide' the reading of the statute." *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004) (quoting *Quantum*, 47 S.W.3d at 476).

When a plaintiff attempts to prove allegations of discrimination through indirect or circumstantial evidence, the claims are considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), recently modified in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004). *See also Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003). Under the modified *McDonnell Douglas* approach, the plaintiff has the initial burden of making a prima facie showing of race and sex discrimination. *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005); *Rachid*, 376 F.3d at 312. A plaintiff satisfies this burden by showing that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) she was replaced by someone or treated less favorably than similarly situated employees who were not members of her protected class. *Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003); *Okoye v. Univ. of Tex. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001). The fourth prong may also be met if a plaintiff shows that she was "treated differently from others similarly situated." *Abarca*, 404 F.3d at 941.

If the plaintiff makes a *prima facie* showing of discrimination, the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.*; *see also M.D. Anderson Hosp. and Tumor Inst. v. Willrich*, 28 S.W.3d 22, 24 (Tex. 2000).

If the defendant satisfies this burden, the presumption of discrimination dissolves. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000); *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002).  The plaintiff must then offer evidence to create a fact issue "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's characteristic (mixed-motives alternative)."  *Rachid*, 376 F.3d at 312 (internal quotation and alteration marks omitted); *see also Cullwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006); *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2001) (analyzing a Title VII claim under the modified approach).  Bardwell argues both pretext and mixed-motive theories of discrimination.  (Docket Entry No. 18, p. 11).

A plaintiff may show pretext by showing that the proffered reasons for the challenged employment action are false or "unworthy of credence," *Laxton v. Gap Inc*., 333 F.3d 572, 578 (5th Cir. 2003); *Gee v. Principi*, 289 F.3d 342, 347–48 (5th Cir. 2002) (an employer's inconsistent explanations for its employment decisions at different times permits a jury to infer that the employer's proffered reasons are pretextual).  As the Supreme Court explained in *Reeves v. Sanderson Plumbing Products, Inc.*:

> The trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an inference is consistent with the general principle of evidence law that the factfinder is entitled

> to consider a party's dishonesty about a material fact as affirmative evidence of guilt.

530 U.S. at 147 (citations and internal quotation marks omitted).  The *Reeves* Court went on to state that there may be rare instances in which a showing of pretext is insufficient to sustain a jury's finding on discrimination, such as when: (1) "the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision", or (2) the plaintiff creates "only a weak issue of fact as to whether the employer's reason was untrue, and there [is] abundant uncontroverted evidence that no discrimination [has] occurred." *Id.* at 148.

In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus.  *Rachid*, 376 F.3d at 312.  The plaintiff has the ultimate burden of showing a genuine issue of material fact on whether the defendant discriminated against her on the basis of the plaintiff's membership in the protected class.  *Reeves*, 530 U.S. at 143.

In its summary judgment motion, Global asserts that Holt fired Bardwell for the legitimate, nondiscriminatory reason that, in violation of company policy, Bardwell failed to make crew change as scheduled on January 21, 2004 without telling either Spear or someone on the Arctic I that she would be unable to return to work on that date.  Global's "Unauthorized Conduct" policies for rig-based personnel state that, "unless the [employee]

presents sufficient evidence . . . that due to personal incapacity beyond his control, such as hospitalization, he was unable to request advance permission," an employee who fails "to check in for crew change" or "return to one's rig assignment following a Company approved rig evacuation" is "subject to disciplinary action up to and including termination." (Docket Entry No. 12, Ex. D, Attachment. 9). Global's "Termination From Active Status" policies for rig-based personnel similarly state that "[e]mployees who fail to return to work following approved leave of absences on the agreed upon date will be terminated." (Docket No. 12, Ex. D, Attachment. 10).

In response, Bardwell argues that Global's stated reason for firing her on January 26, 2004 was pretextual. She asserts that she did telephone Spear and the Arctic I to tell them that she would not be able to make the January 21 crew change. She also asserts that on January 26, when Holt decided to fire her, he and Spear knew that she had missed her crew change five days earlier because of continuing medical problems and treatment. Bardwell also asserts that Global failed to apply its own policies on work absences in a neutral fashion. Bardwell points to Global's failure to fire Brian Moses, a male utility hand on Arctic I. Bardwell argues that Moses had similar work and health circumstances but was not fired despite a failure to comply with Global's leave-of-absence policy. (Docket Entry No. 18, Exs. D & E). Bardwell highlights an email in which Spear summarized the facts about Moses's medical absence and stated that she "was never able to confirm" that Moses was currently able to work, "so we placed him on short term disability." (Docket Entry No. 18,

14

Ex. D).  Bardwell argues that although Global had difficulty contacting Moses about his health situation, Global did not fire him.

Global points to evidence that it fired six people in 2003 and early 2004 for failing to make crew change on the Arctic I and that five of those individuals were male.  Global also argues that Moses is not a proper comparator and that evidence about him is not probative of pretext or discriminatory motive in firing Bardwell.  Global asserts that Moses was not similarly situated to Bardwell because they had different managers at the relevant times.  Holt, who made the decision to fire Bardwell, had left the Arctic I by the time Moses's health problems arose.  Holt did not supervise Moses or make any decisions about how to handle his medical situation.  (Docket Entry No. 20, Ex. M, at 83–84).  Global also argues that the evidence shows that Moses was not similarly situated to Bardwell.  Global asserts that unlike Bardwell, Moses did not miss a crew change without giving advance notice.

The record shows that Moses had been absent at different times because of difficulties in controlling hypertension.  Moses was on FMLA leave from January to April 2004.  The evidence includes a medical form that Moses submitted on December 15, 2003, two days before his scheduled December 17 crew change, stating that he would be unable to return to work until December 22, 2003.  (Docket Entry No. 18, Ex. E).  Bardwell emphasizes the communications surrounding Moses's medical leave from Global in July and August 2004.  The record shows that Moses faxed Spear a doctor's authorization note stating that he could not return to work until he was released by his primary care physician.  On that same day,

15

Moses talked to Spear and told her that he could not work because of high blood pressure. He told Spear that his blood pressure was at "stroke level"; that he was scheduled to see a cardiologist on July 28; and that he would inform Spear of the result of that doctor's appointment.  Spear told Moses to fax her documentation after he saw the doctor on July 28. She called Moses on July 29 and August 3, but could not reach him.  On August 3, Moses left a message on Spears's telephone.  Spear and Moses talked on August 4.  Moses said that he had seen the doctor on July 28, but that there would be a delay in getting paperwork from the visit because the doctor was out of the office until August 6.  The doctor told Moses to continue with medications and return for a follow-up on August 10.  Moses promised to ensure that the doctor faxed Spear the completed medical forms.  Because Moses's accrued days of sick leave had expired and because he was not released to return to work, on August 4 Jeff Young recommended that Global place him on short-term disability leave.  (Docket Entry No. 18, Exs. D, E).  On August 5, Moses's primary care physician – whom Moses had seen on July 19 – completed an attending physician's statement, identifying hypertension as the diagnosis.  In that statement, the doctor replied "N/A" to the question asking how long Moses would be unable to perform his regular job duties.  Spear stated in an October 26, 2004 letter to Dr. Hancock at Global that she "assumed this meant [Moses] could work at this time," but she was "never able to contact him to confirm this, so we never placed him on short-term disability."  On October 18, the cardiologist whom Moses saw on July 28 released him to work effective October 25, 2004.  Spear talked to Moses, who said that the new

16

medication had controlled the high blood pressure and he was "told to go to work for three weeks to see how he would do on the new medication." Spear told Moses that he needed to have the doctor who released him to return to work telephone Dr. Hancock to discuss the case. Dr. Hancock was assured that the problem should be under control as long as Moses took his medication. Global assigned him to a November 11 opening offshore.      Bardwell emphasizes Spears's statement in the October 2004 letter to Dr. Hancock, that Moses had "not been very good with keeping me informed on his medical status" and had given her "conflicting information at times." (Docket Entry No. 18, Ex. D). The record, however, shows that unlike Bardwell, Moses talked to Spear frequently and sent her medical information. The record also shows that Moses did not fail to make a crew change on the scheduled date with no explanation or communication.

Global does not challenge Bardwell's *prima facie* case but does assert that Bardwell has failed to raise a disputed fact issue as to whether the proffered reason for firing her was pretextual or that discrimination was a motivating factor. Bardwell acknowledges the Global policies but argues that Global did not apply them neutrally and that male utility hands were treated more favorably than she was.

Bardwell does present evidence that Global failed to follow its own stated procedures on return from medical leave, but she does not show that Global treated her differently from other similarly situated male employees. Global's official "Return to Work Medical Qualification Procedures" provide that an employee seeking to return from "Company

17

approved medical leave" will receive a copy of Global's "Medical Release to Return to Work Form," which the employee must ask his or her physician to complete, sign, and date before returning the form to Global. (Docket Entry No. 18, Ex. H at 000253). Global also requires additional procedures for rig-based personnel. Its regional medical directors must review all medical release documentation provided by the employee's physician; review with the employee, and separately with the employee's physician, all health-related issues applicable to the employee's absence from work; and schedule the employee to complete appropriate medical and physical assessment procedures if necessary. (*Id.* at 000254). In his deposition, Holt admitted that Global did not follow these procedures in dealing with Bardwell's medical leave and return to work. (Docket Entry No. 18, Ex. A at 53–57).

The evidence shows that Global departed from its procedures for medical leave, but not in a way that treated Bardwell less favorably than similarly situated male employees. Spear testified that Global had a general practice of accepting a doctor's release in lieu of the official Global form in cases of minor illness. (Docket Entry No. 12, Ex. E at 38). Global also had a practice of obtaining information and a doctor's signature for the official Global form via fax when an employee returning to work after a short absence showed up at the dock for crew change. (*Id.*, Ex. E at 39–40). Bardwell has not identified or produced evidence showing that Global applied its written procedures on medical leave differently for her than for similarly situated male utility hands. The present record does not support an inference that the way Global handled Bardwell's scheduled return to work on January 21,

18

2004 differed from the way Global handled the return of similarly situated male employees from medical leave.

Bardwell argues that Moses was a male utility hand with similar health problems who was allowed to return to work despite problems with communicating information about his medical condition to Spear.  A "plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees."  *Okoye*, 245 F.3d at 514 (5th Cir. 2001) (internal quotations omitted); *see also Berquist v. Wash. Mut. Bank*, No. 05-20956, 2007 WL 2007333, at *7 (5th Cir. Jul. 12, 2007) ("In disparate treatment cases, the plaintiff-employee must show 'nearly identical' circumstances for employees to be considered similarly situated."); *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001) ("Or put another way, the conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer.").

The evidence does not show that Moses and Bardwell were similarly situated or engaged in nearly identical conduct.  The evidence shows that Moses did timely submit a medical release before his scheduled crew change in December 2003.  As far as Global knew, Bardwell did not provide notice that she would not make her scheduled crew change.  The evidence shows that although Moses did not always provide clear or consistent information

about his medical condition, he did talk to Spear frequently to keep her informed – over an extended period during which he had difficulty in controlling his hypertension – about the different doctors he was seeing.  Moses sent Spear information from his doctors or asked his doctor to do so.  Bardwell, by contrast, did not succeed in contacting Spear or Holt between January 13 and January 21 to explain that she would be unable to make her scheduled crew change.  She did not send a doctor's note to excuse her extended absence until after she had missed the crew charge.

In addition, the Fifth Circuit has held that if two employees have different supervisors, that weighs against a finding that the employees are similarly situated.  *See Little v. Republic Refining Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991).  In *Little*, the plaintiff attempted to prove age discrimination in part by showing that his supervisor had not counseled him about the problems in his job performance but did provide such beneficial counseling to his replacement, a younger man.  The Fifth Circuit found that the plaintiff's complaint was not probative of disparate treatment because the supervisor who had counseled the younger man was not the plaintiff's supervisor at when the decision was made to fire the plaintiff.  *Id.* Similarly, the evidence in the record shows that  Holt, who made the decision to fire Bardwell after she failed to make the January 21 crew change, was no longer the Arctic I rig manager when Moses's health problems arose.  (Docket Entry No. 20, Ex. M, at 83–84).  There is no evidence to suggest that Holt made or influenced the decision to allow Moses to continue to work.  Because Moses's and Bardwell's cases do not present nearly identical

circumstances, they are not similarly situated for the purpose of showing disparate treatment. Bardwell has not controverted Global's evidence that in the year before it fired her, five out of the six employees who were fired for failing to make crew changes were male.

A plaintiff can raise a fact issue as to pretext "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (internal citations and quotations omitted). As explained above, Bardwell has failed to identify or present evidence of disparate treatment. Bardwell argues that Global's proffered explanation is pretextual because she "had communicated her illness on numerous occasions," so that Holt "terminated Plaintiff knowing of her medical condition and direct communication from her doctor" on January 26, 2004. Bardwell also refers to excerpts from Holt's deposition testimony to demonstrate his bias against females. (Docket Entry No. 18, Ex. A at 16, 63).

The evidence shows that on January 6, the day before she was scheduled to report to be transported to the Arctic I, Bardwell's fiancé called the rig to report that she was sick and would not be able to make the crew change. Holt and Spear were both told of the message. Spear reached Bardwell by telephone on January 7 and told her that she needed a written note from her doctor. Dr. Allen faxed a letter to Spear that contained an incorrect date for the follow-up appointment. Spear telephoned Bardwell to tell her about the mistake and to ask for a correct note from the doctor. On January 8, Spear received the doctor's letter stating that Bardwell was to see the doctor on January 13. After that follow-up appointment, the

doctor faxed Spear an excused-absence form stating that Bardwell could return to work on January 20.  Bardwell talked to Spear on January 13.  Spear told Bardwell that she would be able to return to work on January 20.  Bardwell was scheduled to return on January 21, to be transported to the rig to work the last week of the hitch.  Spear told Holt of the arrangements. Holt questioned whether the return to work form was sufficiently detailed to ensure that Bardwell was cleared for offshore work and asked Spear to get a more detailed release. Spear telephoned Bardwell several times between January 13 and 21, using both Spear's home and cell phone numbers.  According to Spear, Bardwell did not return her calls. According to Holt, Bardwell did not telephone the Arctic I after January 6.  Bardwell does not assert that she talked to Spear or Holt.  Bardwell does assert that she telephoned the Arctic I on January 19 or 20 and that she telephoned Spear sometime between January 13 and 19.

Bardwell's testimony that she telephoned Spear or the Arctic I between January 13 and January 20 does not raise a fact issue as to whether the decision to fire her because she failed to tell Spear or the Arctic I that she would be unable to make the January 21 crew change was pretextual or that discrimination was a motivating factor.  Global's telephone records confirm Spear's deposition testimony that she called Bardwell several times on January 19 and 20.  (Docket Entry No. 12, Ex. G, Attachment 1; Ex. E at 27–28).  The telephone records show that no Global telephone extension (including the Arctic I) received any calls from Spear's cell phone or home phone between January 13 and January 26, 2004.

22

(Docket Entry No. 12, Ex. G, Attachments. 1 & 2).  Although Bardwell asserts that while she was sick, she telephoned the Arctic I on January 19 or 20 and telephoned Spear between January 13 and 19, the telephone records show no such calls.  *As far as Global knew*, Bardwell had failed to contact Global to report her continued illness and inability to return to work as scheduled.  As a result, Bardwell has not raised a fact issue as to whether Global's stated reason for terminating her employment – that Bardwell failed to inform Global that she would not make her scheduled crew change on January 21, 2004 – was "false or unworthy of credence."  *Laxton*, 333 F.3d at 578.

When an employee is discharged for failing to comply with a work rule, the issue is whether the employer reasonably and in good faith believed that the violation occurred.  *Waggoner v. City of Garland*, 987 F.2d 1160, 1165–66 (1993) ("[T]he inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief.");  *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995));  *McCombs v. MS Commc'ns Am., Inc.*, No. CIV.A.SA00CA0623NN, 2002 WL 1491724, at *7 (W.D. Tex. 2002 Apr. 23, 2002) ("The critical issue . . . is whether the defendants believed in good faith that the plaintiff had committed the offensive behavior and that plaintiff was terminated for that reason.") (citing *Waggoner*, 987 F.2d at 1165).  The question is not whether an employer made an erroneous decision; it is whether the decision was pretextual or made with discriminatory motive.  The undisputed evidence in the record shows that as far as Spear and Holt knew, Bardwell had

23

failed to tell Global that she would not return to work when she had said she would and when her doctor had stated she was able to do so.  Bardwell has not identified or presented evidence that raises a fact issue as to whether Global's decision to fire her for failing to report for crew change or tell Global that she would be unable to do so was pretextual or motivated in part by discrimination.

Holt testified that when he formally fired Bardwell on January 26, he had received an email from Spear detailing the chain of events regarding Bardwell's illness, including Global's receipt on that date of a second excused absence form from Dr. Allen.  Spear told Holt that this second form was dated January 26 and stated that Bardwell would be able to return to work on January 27, the date her hitch ended.  Holt stated in his email to Spear that "[d]ue to [Bardwell's] inability to contact this office, she is being terminated." (Docket Entry No. 15, Ex. H).  Evidence that Holt knew about Dr. Allen's January 26 excuse form does not raise a fact issue as to whether Global's legitimate, nondiscriminatory reason for discharging Bardwell – that she had failed to inform Global in a timely manner that she would not be able make her scheduled crew change on January 21, 2004 – was pretextual or that discrimination was a motivating factor.

Bardwell also asserts that evidence of Holt's bias against females raises a fact issue as to whether Global's reason for her discharge is false or unworthy of credence or that discrimination was a motivating factor in the decision.  A plaintiff can raise a fact issue as to whether an employer had mixed motives by showing that "the defendant's reason, while

24

true, is only one of the reasons for its conduct and that another motivating factor was the plaintiff's protected characteristic." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d at 347. In his deposition, Holt admitted that the number of women working on the Arctic I decreased during his tenure as rig manager, (Docket Entry No. 18, Ex. A at 16), and that he had not recommended hiring a woman. (*Id.* at 63.). However, he further testified that he recommended at least two women for promotions from the Arctic I, and that he personally had no influence over the hiring of women for work on the Arctic I. (Docket Entry No. 20, Ex. M at 109–12). Global presented evidence, which Bardwell did not controvert, that it had fired five male employees in the year before Bardwell was fired for failing to make crew changes as scheduled and without notice. Based on the record, Bardwell has not raised a fact issue as to whether Global's legitimate, nondiscriminatory reason for terminating her employment was pretextual or that Bardwell's sex was a motivating factor in Holt's decision to terminate her.

Global's motion for summary judgment on the sex discrimination claim is granted.

## IV.   The FMLA Claim

Global has moved for summary judgment that Bardwell is not entitled to recover under the FMLA. Bardwell has cross-moved for partial summary judgment that Global violated the FMLA when it fired her. The FMLA applies to private-sector employers who have 50 or more employees. 29 U.S.C. § 2611(4). An employee is eligible for FMLA leave if she has worked for a covered employer for at least 1,250 hours during the preceding 12

months.  29 U.S.C. § 2611(2).

An eligible employee is entitled to 12 work weeks of leave in a 12-month period because of, among other things, a "serious health condition" that results in the employee's inability to perform her job requirements.  29 U.S.C. § 2612(a).  The employer may require an employee to support a request for FMLA leave with a certification from a health care provider that includes information about when the serious health condition began, the probable duration of the condition, and the medical information known to the health care provider about the situation.  29 U.S.C. § 2613(a), (b).  An eligible employee who takes FMLA leave is entitled, upon returning from leave, to be restored to her original position or to an equivalent position.  29 U.S.C. § 2614.

The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider." 29 U.S.C. § 2611(11).  Regulations under the FMLA are promulgated at 29 C.F.R. § 825.100 *et seq*.  Section 825.114(a)(2) defines a "serious health condition involving continuing treatment by a health care provider" as including:

> (1) a period of incapacity (i.e., inability to work . . .) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> > (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

> (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2). "Treatment" is defined to include "examinations to determine if a serious health condition exists and evaluations of the condition."  29 C.F.R. 825.114(b). "A regimen of continuing treatment by a health care provider" includes "a course of prescription medication (e.g., an antibiotic)," but excludes "a regimen of continuing treatment that includes the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider." *Id.*  In *Murray v. Red Kap*, 124 F.3d 695, 698 (1997), the Fifth Circuit explained that "under the regulation, where an employee alleges that he has a serious health condition involving continuing treatment by a health care provider, he must first demonstrate a period of incapacity (i.e., the inability to work) for at least four consecutive days.  Next, he must show that he received subsequent treatment or had a period of incapacity, in which he was seen at least two times by a health care provider (or a qualified provider of health care services) or obtained a regimen of continuing treatment under the supervision of a health care provider."

Global argues that Bardwell was not protected by the FMLA when she was fired because she did not have a "serious health condition" to justify her absence from work after January 20, 2004.  On January 13, both Dr. Allen and Bardwell told Spear that Bardwell would be able to return to work on January 20.  In addition, Global asserts that Bardwell

lacked FMLA protection when she was discharged because she failed to follow Global's procedures governing employees returning from medical absences.  Global argues that, under Section 825.309(c) of the FMLA, it was entitled to enforce its procedures requiring an employee to provide notice if she would not be able to make crew change as scheduled, even if the absence is covered by the FMLA.[2]  (Docket Entry No. 12).

In response, Bardwell argues that she was protected by the FMLA because she had a "serious health condition" that warranted continuing treatment from Dr. Allen until January 27, 2004.  She also asserts that Global cannot rely on her failure to abide by its procedures as a justification for her job termination because that policy was not applied to all Global employees.  To support this assertion, Bardwell again relies on Global's treatment of Brian Moses.  Bardwell finally argues that she gave Global the notice about her illness that the FMLA requires, but that Global did not timely advise her that she was not eligible for FMLA leave.  Bardwell argues that her original notice of leave, given on January 5 or 6, 2004, would be "considered outstanding" until Global told her she was not eligible for FMLA leave.  29 C.F.R. § 825.110(d).

---

[2]  Global also argues that Bardwell has not met her burden of showing that Global is an employer covered by the FMLA in the location where Bardwell worked.  (Docket Entry No. 17).  Global argues that it has admitted that it is an FMLA-covered employer in some geographical locations, but not in others.  (Docket Entry No. 15, Ex. B).  Bardwell includes in her summary judgment evidence statement by Diane Spear in her deposition that Bardwell would have been eligible for FMLA leave if she had requested it.  (*Id.*, Ex. C at 51).  Bardwell also points to a copy of Global's benefits brochure, which states that "[u]nder the Family and Medical Leave Act (FMLA), employees are eligible" for leave, and which makes no distinction between employees at different geographic locations.  (Docket *Id.*, Ex. D at 000605).  There is no disputed issue as to whether Global is an employer covered by the FMLA.

Based on the present record, Global has not shown that Bardwell fails to meet the "serious health condition" requirement.   Global argues that because Bardwell's illnesses amounted to "a sinus infection" and a "headache" and had no complications, she did not have a "serious health condition."   (Docket Entry No. 12).   Section 825.114(c) clarifies that "unless complications arise, the common cold, the flu, ear aches, upset stomach," and other similar minor illnesses "are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave."   The record does not support a conclusion that as a matter of law, Bardwell is disqualified from FMLA protection because she had a sinus infection.

Confronted with a similar argument about FMLA coverage for an employee suffering from the flu, the Fourth Circuit acknowledged "some tension" between Section 825.114(a), which sets out "objective criteria for determining whether a serious health condition exists," and Section 825.114(c), "which states that certain enumerated conditions 'ordinarily' are not serious health conditions." *Miller v. AT&T Corp.*, 250 F.3d 820, 831 (4th Cir. 2001).   After an extensive survey of the legislative history of the FMLA, the court determined that Section 825.114(c) "simply does not automatically exclude the flu from coverage under the FMLA. Rather, the provision is best read as clarifying that some common illnesses will not ordinarily meet the regulatory criteria and thus will not be covered under the FMLA."   *Id.* at 832. "Consistent with the statutory language, the regulations promulgated by the Secretary of Labor establish a definition of 'serious health condition' that focuses on the effect of an

illness on the employee and the extent of necessary treatment rather than on the particular diagnosis." *Id.* at 835.  Under this approach, Global's argument that Bardwell's condition is automatically disqualified from FMLA protection because sinusitis and temporal neuritis may be "common illnesses" is insufficient.  The critical issues are the effect of the illness and the extent of treatment she required.

Global next argues that Bardwell did not have a serious health condition on January 20, 2004 because Dr. Allen's medical records and testimony reflect consistent improvement in Bardwell's health up to that date.  (Docket Entry No. 12).  Whether an employee has a "serious health condition" is determined objectively, not subjectively, under the criteria outlined in Section 825.114(a).  *See Russell v. North Broward Hosp.*, 346 F.3d 1335, 1345 (11th Cir. 2003) ("[T]he regulatory objective test for 'serious health condition' . . . avoids the need for employers – and ultimately courts – to make subjective decisions about statutory 'serious health conditions . . . .'") (citing *Thorson v. Gemini, Inc.*, 205 F.3d 370, 380 (8th Cir. 2000) (internal quotations omitted); *Snelling v. Stark Properties, Inc.*, No. 5:5CV46 DF, 2006 WL 2078562, at *12 (M.D.Ga July 24, 2006) ("[T]he phrase 'serious health condition' is defined objectively, not subjectively.").  To establish a "serious health condition" under the objective criteria of Section 825.114(a), Bardwell must demonstrate that she suffered from a period of incapacity of more than three consecutive calendar days, and that she subsequently received treatment or had a period of incapacity in which she received treatment at least two times by a health-care provider or obtained a regimen of continuing

30

treatment under the supervision of a health-care provider.  *See Murray*, 124 F.3d at 698.

Section 825.114(b) states that "[t]reatment . . . includes (but is not limited to) examinations

to determine if a serious health condition exists and evaluations of the condition."  A

"regimen of continuing treatment" includes "a course of prescription medication." 29 C.F.R.

825.114(b).

Global does not dispute that Bardwell was incapacitated and unable to work for a

period "of more than three consecutive calendar days" under Section 825.114(a)(2)(i).  After

this initial period of incapacity, Bardwell met with Dr. Allen at least two or three times,

depending on whether her incapacity began before or on January 5, 2004, when she first met

with Dr. Allen.  He prescribed her medication for her symptoms during each of these

appointments.  Global argues that Bardwell's visit to Dr. Allen on January 26, 2004 was not

a scheduled follow-up, and was only to obtain a changed medical-release form that would

excuse her absence through January 27 rather than January 20, as the previous form had

stated.  Global points to Dr. Allen's deposition testimony that the only reason he wrote that

Bardwell had been unable to work since January 5, 2004 was because Bardwell asked him

to add those words to the form.  (Docket Entry No. 12, Ex. F, pp. 26-27).  Dr. Allen testified

that in the January 26 visit, he continued Bardwell's prescription of antihistamine medication

because she was still experiencing sinus symptoms.  (Docket Entry No. 17, Ex. F).

Bardwell's visits with Dr. Allen at least raise a fact issue as to whether she received two or

more instances of treatment after her initial period of incapacity under Section

31

825.114(a)(2)(i)(A).  Alternatively, Bardwell's visits raise a fact issue as to whether she received at least one instance of treatment resulting in a course of prescription medication under Dr. Allen's supervision under Section 825.114(a)(2)(i)(B).

However, although the record supports Bardwell's claim that she had a "serious health condition" that qualified her for FMLA-protected leave, the record does not raise a fact issue as to whether Global violated FMLA's prescriptive requirements by terminating her employment.  The FMLA allows an employer to "requir[e] an employee on leave under section 2612 . . . to report periodically to the employer on the status and intention of the employee to return to work."  29 U.S.C. § 2615(a); *see also* 29 C.F.R. § 825.309(a) ("An employer may require an employee on FMLA leave to report periodically on the employee's status and intent to return to work.").  The FMLA allows such reporting requirements so that employers are not placed "in a position of grave uncertainty in complying with their obligations under the FMLA."  *Jones v. Denver Pub. Schs.*, 427 F.3d 1315, 1320 (10th Cir. 2005).  The FMLA does not "authorize employees on leave to keep their employers in the dark about when they will return."  *Gilliam v. United Parcel Serv., Inc.*, 233 F.3d 969, 971 (7th Cir. 2000).  Bardwell's failure to inform Global that she would not make her scheduled crew change on January 21, 2004 is a permissible ground for Global to terminate her employment.

Bardwell had informed Global on January 13, 2004 that, notwithstanding her illness, she would be able to return to work on January 20, 2004.  A fax from Dr. Allen on January

13 confirmed this.  Based on this notification, Global made arrangements for Bardwell to return to her position on the Arctic I, which required helicopter transport.  Bardwell and Spear communicated on January 13 to schedule her return to work on January 21, when helicopter transportation to the Arctic I was available.  Spear made six phone calls on January 19 and 20 to Bardwell.  Bardwell testified that she telephoned Spear sometime between January 13 and 20 and left a message to return the call, and testified that she called someone on the Arctic I on January 19 or 20 and told the person who answered that she would not be able to return to work January 21.  As noted, the telephone records show no telephone calls from Bardwell's cell or home telephones to the Arctic I after January 6 or to Spear after January 13.  Bardwell did not testify that anyone called on her behalf.  To the contrary, she testified that she had called either Spear or the Arctic I.  Nor did Bardwell testify that she telephoned from anywhere else but her home; indeed, she testified that she was at home sick.  The record shows that Global had a reasonable and good-faith belief that Bardwell had failed to advise them, in advance, that she would be unable to return to work on the rig as scheduled on January 21.  Bardwell failed to show up as expected for the January 21, 2004 crew change.

Although the record does not raise a fact issue as to whether Bardwell's serious health condition was protected by the FMLA, the FMLA does not excuse Bardwell's failure to inform Global that she would not make her scheduled crew change.  "Because the FMLA was intended to permit 'reasonable leave for medical reasons . . . in a manner that

33

accommodates the legitimate interests of employers, employers are entitled to require absent employees to furnish reports on their 'status and intention . . . to return to work' and verification of an employee's claimed need for medical leave." *Woods v. Daimler-Chrysler Corp.*, 409 F.3d 984, 991 (8th Cir. 2005). "Employees who fail to comply with legitimate reporting requirements set by their employers are not entitled to reinstatement, however, nor are employees who were subject to discharge for reasons other than their requests for FMLA leave." *Id.*; *see also Holmes v. The Boeing Co.*, No. 98-3056, 1999 WL 9670, at * 3 (10th Cir. Jan. 12, 1999) ("The FMLA does not prohibit an employer from requiring its employees to give notice to specific company supervisors on the day the employee is going to be absent in a nonemergency situation."). Global's termination of Bardwell's employment did not violate the FMLA.

Bardwell's reliance on Section 825.110(d) as validating her leave until Global objected does not entitle her to partial summary judgment or preclude granting Global's motion. Section 825.110(d) deals with an employee's eligibility for leave under the FMLA. Eligibility is defined in terms of how long the employee had been employed and how many hours the employee has worked in the 12 months immediately preceding the beginning of FMLA-protected leave, not in terms of whether the employee has a "serious health condition." *See* 29 C.F.R. § 825.110(a). Section 825.110(d) addresses an ineligible employee's notice to the employer that the employee wants to receive FMLA leave. An employer receiving such notice must advise the employee that he or she is ineligible for leave

34

under the FMLA.  If the employer fails to do so, the employee's "notice of leave is considered current and outstanding until the employer does advise." 29 C.F.R. § 825.110(d). Whether an employee has a "serious health condition" does not determine whether an employee is eligible for leave under the FMLA.  A "serious health condition" is merely one criteria an employee must satisfy to be entitled to leave.  See 29 U.S.C. § 2512 (a)(1) ("[A]n eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . because of a serious health condition.").   Bardwell cannot rely on Section 825.110(d) to extend her original notice of a "serious health condition," given on January 5, 2004,  to cover her unexcused absence on January 21, 2004.  *See, e.g., Dormeyer v. Comerica Bank-Illinois*, 223 F.3d 579 (7th Cir. 2000) ("The statute is perfectly clear . . . . The right of family leave is conferred only on employees who have worked at least 1,250 hours in the previous 12 months."); *Plumley v. Southern Container, Inc.*, No. 00-140-P-C, 2001 WL 1188469, at *7 (D.Me. Oct. 9, 2001) ("[T]hat regulation [29 C.F.R. § 825.110] deals only with the calculation of the twelve months of employment required by 29 U.S.C. § 2611(2)(A)(i).").[3]  Global had no reason under Section 825.110(d) to inform Bardwell that she was ineligible for FMLA leave.

Bardwell also argues that Global's procedures for employee status reports were not

---

[3]  Bardwell fails to cite to any cases applying Section 825.110(d) to find that the employee's notice of a "serious health condition" continues until the employer notifies the employee otherwise.  Case law interpreting Section 825.110(d) addresses only the issue of notice of eligibility under Section 825.110(a) by employees and employers. *See, e.g., Mutchler v. Dunlap Memorial Hosp.*, 485 F.3d 854, 855 (6th Cir. 2007); *Dormeyer v. Comerica Bank-Illinois*, 223 F.3d 579, 581 (7th Cir. 2000); *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 793 (11th Cir. 2000).

neutrally applied, relying on Global's treatment of Moses to show that Global was inconsistent in its approach.  Bardwell asserts that, as a result, she cannot be penalized for her failure to report her status and intent to return to work under Section 825.309(a), which provides that an employer's reporting policy "may not be discriminatory."  This argument also fails.  The record shows that Global failed to follow its "Medical Leave of Absence" procedures for employees returning from medical leave, but did so in a consistent fashion. Bardwell has failed to identify or present evidence that supports an inference that Global's approach resulted in less favorable or otherwise discriminatory treatment of Bardwell as compared to other Global employees.

Moreover, Global does not rely on its "Medical Leave of Absence" procedures as the reason why Bardwell was fired.  These are the procedures an employee must follow to return to work after a medical leave of absence.  These procedures do not provide for termination of employment if an employee fails to abide by them.  Global relies on its "Unauthorized Conduct" and "Termination From Active Status" procedures.  Under these policies, an employee's failure to inform a supervisor in advance of her failure to report for work will be subject to disciplinary action, including termination.  (Docket Entry No. 12, Ex. D, Attachments. 9 & 10).  Bardwell does not point to any evidence demonstrating that Global has applied these termination policies in a discriminatory way.

In summary, the FMLA protections did not prevent Global from terminating Bardwell's employment due to her failure to inform Global in advance that she would not

make her scheduled crew change on January 21, 2004.  Global's motion for summary judgment on the FMLA claim is granted; Bardwell's motion for partial summary judgment is denied .

## VI.    Conclusion and Order

Global's motion for summary judgment is granted.  Bardwell's motion for partial summary judgment is denied.  Global's motion to strike Bardwell's experts is denied as moot.

SIGNED on August 23, 2007, at Houston, Texas.

_____
                        Lee H. Rosenthal
                United States District Judge